The next case set for oral argument this morning is Charlene Bynum v. Correct Care Solutions, LLC. Good morning, Your Honor. If it pleases the Court, Dan Winder on behalf of the appellant Charlene Bynum, I'd like to point out that Ms. Bynum, along with her children, are here present in court today. Thank you. This case stems from Mr. Bynum, who almost six years ago, in February of 2016, called the North Las Vegas Police Department because he believed there was a burglar or someone in his home. The police department comes, they enter the home, they determine that they allege allegations that there was a small amount of marijuana found in the bedroom. Mr. Bynum was actually not in the home, he was in his vehicle. He is later restrained by the police department. They find him to be incoherent at that time. They actually indicate that they place his full body weight, one of the officers, is placed on Mr. Bynum's back. He is taken into custody after the North Las Vegas Fire Department was called, who failed in their notes to show that they actually treated him after he had been tased. While he was at the jail, he was restrained. During the course of those restraints, either through the full body weight being placed on him or the restraints that occurred at the jail, he received wounds. A number of those open wounds and the skin being broken were all the way down to his cossacks. He was not eating, he was not drinking, he was dehydrated, and eventually he suffered sepsis and a heart attack and is still in a coma today. So remind me, you've settled with whom? You've settled with... We've settled with the city of Las Vegas. And that covered the arresting officers? No, it did not. The arresting officers were from North Las Vegas. So that particular case, in the correct care solutions, is the privatized corporation that services the inmates at the jail. What has happened in this particular case is Judge Gordon ruled that each defendant personally must participate in the alleged deprivation of rights in a 1983 action. And we believe in this particular case that it's obvious that a number of these individuals did not deprive my client of his rights. He did not receive medical treatment despite the fact that he had serious medical needs, and that's a 14th Amendment violation. And in fact, the failure to provide... whether or not each of these medical professionals knew about his medical needs, and whether or not they exercised their professional judgment based on what they did know, or they were just, you know, objectively unreasonable. So can you talk about that a little bit? Tell me why you think that there was sufficient evidence that you provided to the district court. Yes, Your Honor. And I think that's a genuine issue of fact, material fact, that needs to be placed in front of a jury for the jury to provide the full extent of their knowledge. But he was placed in isolation. He actually was, during the course of being placed in isolation, the nurses would observe him, medical personnel would observe him. I think the nurses observed him every 15 minutes. The officers from the jail would go to the cell every two hours. So they clearly, in their reports, indicate that he was not eating, that he was not drinking, that he was chained to a bed or had restraints, that he was on the floor, he had taken off all of his clothes, that he was naked there. And through these observations, they clearly could see that he had mental health problems. In fact, one of the nurses indicated in her notes that he needed to see a doctor. But they didn't have him see a doctor for three days, not until they finally realized he was slumped over. And at that point, he went into cardiac arrest. So the nurses who observed him, just as if you were to see your child in mental distress, see your child not eating, not urinating, not drinking so they're dehydrated, if you would see that child having mental health problems, needing medical attention, then you have a duty then to get that attention, to get that medical treatment. And in this case, they did not. So their failure to do anything, despite having that duty and despite having him in an isolated cell where they were observing him on a regular basis and then not to get him the medical treatment he needed, I believe rises to the level of them having personally deprived him of his rights, Your Honor. Can you still prevail if we assume that the district court correctly excluded Dr. Durand's expert report? And another way of just looking at it is, you know, if you look at the big picture with knowing all the facts, clearly very troubling. On the other hand, you're suing a lot of individual defendants who only had a certain snapshot of information. I know you're trying to fill in the gap there about standard of care with Dr. Durand's report. If the district court correctly excluded that, how does that affect your case? Well, I believe that it was improper for them to exclude that report. Dr. Durand indicates that just had they given him a sedative, that could have prevented the catastrophic situation that he's currently in, being hospitalized, excuse me, being in a coma for the last seven years, Your Honor. And I believe even Judge Gordon in his ruling, he states, and I quote, I am troubled by some of the facts in this case. Bynum displayed visible and consistent signs of mental distress throughout his time in jail. He was on his back on the floor, tangled in his restraints for three hours before he was assisted. Further, Bynum appeared unable or unwilling to drink, eat, or use the restroom for long periods of time. Bynum was also restrained without access to move around or use the restroom or sink for a total of 33 hours. Ten hours in intake, 23 hours in the first cell. And when he was in his isolation cell, he was naked and talking to himself. Yet, he spent three days without being seen by a doctor or a psychiatrist. So he was isolated, he was being observed. And our expert says that had they simply treated him and even given him a sedative so that he would calm down, then he would not have gotten to the point where the sepsis or dehydration, his medical situation, would have gotten to the point where he would now have been in a coma. And he's been in a coma for almost seven years now. So I believe there are certainly genuine issues of fact that should go before the jury, that Judge Gordon's ruling was inappropriate and that this court should reverse that. Do you want to reserve the balance? I would reserve the balance, Your Honor. Okay. Good morning. Good morning, Your Honors. Brent Vogel on behalf of Correct Care Solutions, now known as WellPath and the 10 identified nurses. I appreciate the opportunity to discuss the case with you here today. And what we have here is the issue really is the failure to provide relevant admissible evidence in response to the motion for summary judgment to support the claims. You know, the claims here are a 1983 claim against CCS, then separate 1983 claims against the nurses, and then state law malpractice claims. And in order to prevail on the denial of medical care to a pretrial detainee under the Due Process Clause of the 14th Amendment, there's four criteria that have to be met. They have to show that the defendants made an intentional decision with respect to the conditions under which the plaintiff was confined. Those conditions put the plaintiff at substantial risk of suffering serious harm. Third element is that the defendants did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstance would have appreciated the high risk involved, making the consequences of the defendant's conduct obvious. And by not taking such measures, defendants caused the plaintiff's injuries. And the key one here is the third one, the third element, based on, you know, Gordon v. City of Orange. Oh, do you concede that the first two were met? Pardon? I'm sorry, I didn't hear your question. I'm sorry, are the first two conditions met in this case? Well, I'm not sure they even met that with respect to the nurses, because the nurses don't decide where someone is kept. They can give their input to the officers, but it's actually the officers in the jail that has the final say with respect to where an inmate is housed. They certainly knew where he was, but they aren't the ones who actually make the decision as to where he is placed. And the second condition, was he put at substantial risk of suffering serious harm? I don't think that's met either. I think they needed some expert testimony on that to meet that standard. And in this case, when you look at the evidence that was proffered, Judge Gordon went through the 702 analysis and made the determination, based on the record and what they submitted in opposition, that they did not meet that standard, because Dr. Duran basically made conclusions without any sort of citation to the evidence. And when you look at, first of all, CCS, in order to get a, in order to proceed with the claim against Correct Care Solution, the entity, they have to have provided some sort of policy that the company had that violated Mr. Bynum's rights. And as Judge Gordon properly pointed out, they provide no evidence of a policy by CCS to deprive someone of their medical care, that they had some sort of pattern or routine practice of, you know, not treating or screening combative patients and ignoring their mental health. Mr. Vogel, I mean, I guess like the district court, I'm troubled by some of the facts in this case. Multiple nurses noticed that Mr. Bynum was psychotic or in some sort of extreme psychological distress or experiencing, you know, significant mental health needs. Yet, it looks like for three days, Mr. Bynum was not seen by a doctor or taken to a hospital. And I guess in light of our standard, viewing the evidence in light most favorable to Mr. Bynum, why couldn't a jury find that CCS nurses were deliberately indifferent to Mr. Bynum's serious medical needs when they recognized Mr. Bynum was in this extreme psychological state and they observed his abnormal and combative behaviors and his refusal to be medically screened, to eat, to failure to drink and the use of the restroom? I guess if you could just try to explain that to me. Mr. Vogel Sure. And I think there's two categories of nurses. There's nurses Halpin, Avena, Nares and Darden. All they did was respond to the code after the heart attack had occurred. So with respect to those, they are not the ones who had been observing any sort of behavior by Mr. Bynum. So as to those four, there's clearly there's no evidence that they had any sort of deliberate indifference towards him. And all they did was respond to the code afterwards. With respect to the other nurses, and those are Chino, Nosey, Nells, Tolentino, Schott and Swan. Yes, sometimes he was combative, but at other times he was calm and appropriate. They were able to get his vital signs. And the analysis that the court makes is what did each one of them observe? And the key case that the appellants are relying on is the Gibson case. And in Gibson, we have very different facts than what we have here. In Gibson, what you have was somebody who came in who had a diagnosis. He had already been diagnosed with mental health issues. He'd been treated in the hospital for it. He had medication for it. We don't have that here. We have someone who came in who was being combative, who at times was, you know, was uncooperative. But then at other times was cooperative. And he had no definitive diagnosis of psychosis. In fact, the only evidence that we have was from Ms. Charlene Bynum. She had no knowledge of any sort of prior medical condition from Mr. Bynum. So, we don't have a situation where the nursing staff knew he had a serious medical condition. Also in Gibson, you had somebody who came in with medication. The officers gave the nurse in Gibson the medication. And she looked at the medication, knew it was a psychotropic medication and that it could help him. Yet she didn't tell anybody else about that. We don't have that here. Also in Gibson, the nurse knew that the medication could stabilize him. Yet she didn't give it to him and didn't tell anybody else about it. Also in Gibson, you had somebody who was continually combative. And help me with the facts here. Did the nurses inquire or ask for a doctor's review in light of what they did see? Because it seems like it was troubling. So, even though they didn't know, it seems like there would be some level of responsibility on their part. Yeah. And based on the deposition testimony of the nurses, they were trying to screen him. And he was seen by a psychiatric nurse, not a physician. And the total time involved here was approximately 33 hours. While it covered three calendar days, we're talking really about a little over a day and a half total time. And the plan eventually would have been to get him seen by a physician. But it didn't come to pass during that time period. But what we're getting to, and maybe getting a little off track on here, is it's got to be objectively unreasonable based on the observations of each one of these nurses. What they saw at their point in time with respect to this particular patient. On that point, I guess one of your key arguments is that if you look at each individual defendant, he or she really didn't have all the information. But on the other hand, you look at all the facts here. I mean, it is pretty disturbing. I mean, here's a guy who gets arrested for a crime that I don't think the state really takes that seriously. He's taken in. He clearly has some mental breakdown. He's chained to a bench for 23, 24 hours. And it looks like for a Monell claim, looks like a policy that hasn't been identified. So is this just a case of, you know, you look at all the facts, it looks bad and disturbing, but tough luck because there were so many people involved and each person didn't know all the facts? No, that's not what I'm saying. First of all, we're still talking about the constitutional claim, the 1983 claim, which means they have to have been deliberately indifferent to his needs. And that requires a showing as to each individual actor what they knew and what they did. And we don't have any evidence, not under Gibson and not from their expert, indicating what each one knew and what they did that was deliberately indifferent from, you know, from an objective reasonableness, objectively unreasonable position under Gordon. But I thought you just told us that some of these nurses believed that physicians' care and attention was required but, in your words, didn't get around to it. That's what you said. Well, sure. And this gets to, you know, a malpractice claim. I mean, if they wanted to bring – well, they did bring a state law malpractice claim but didn't bring it properly. I'm not saying that they could have brought a good malpractice claim and said, hey, this was below the standard of care to do X, Y, and Z. But that doesn't cross the line from professional judgment into somebody that's being deliberately indifferent based on the facts that were presented to Judge Gordon in the underlying case. There is nothing that was tied to any sort of policy.  They could have done something different but, you know, they approved it anyway. There's nothing under the case law surrounding 1983 claims that was presented in opposition to summary judgment to show that what each of these nurses did was deliberately indifferent on an objective unreasonableness. All right. See if I can get this out. Objectively unreasonable. How do you respond to Mrs. Bynum's argument that this case is like banks? Banks versus Sunrise Hospital? Yes. Because Mr. Bynum suffered a heart injury while CCS nurses – Yes. Well, Banks versus Sunrise Hospital has completely different facts. Othelie Banks went in for a shoulder surgery, and during the course of that surgery, he suffered some sort of incident allegedly due to a malfunction of the anesthesia machine resulting in him coming out in a coma. And that was a malpractice case. And what happened in that case is the Supreme Court – the real crux of that case was that the hospital failed to preserve the anesthesia machine and instruction was given to the jury that their failure to do so meant that they were probably hiding something and there was an adverse inference against the hospital with respect to not preserving the anesthesia machine. That's completely different than this case because we have someone who was a pretrial detainee who came in and was acting irrationally, which is not unusual for some inmates coming into the jail. That's not an unusual situation. But then had a heart attack while he was in custody. And if you look at it with the benefit of hindsight, say, well, because there was a bad outcome, something must have been done wrong. I don't think that's a fair analysis. But when you look at the facts of the Banks case, it's a totally different situation. You've got somebody who's going into surgery. They were performing surgery on his shoulder. And during that, he had some sort of cardiac event, ended up in a coma. And in that case, there was a discussion that, well, they were operating on his shoulder, but there was an injury to his brain as a result. So that allowed a certain amount of a res ipsa claim. But here in this case, they're alleging a lack of care. So there isn't any sort of treatment to any part of the body and then an injury to a part that wasn't involved. And I think Judge Gordon's analysis on that was correct. And it's consistent with Nevada state law that if you're going to make a res ipsa claim, there has to have been some sort of procedure going on and the injury happening to a different part of the body, similar to what happened in Banks. This isn't that situation. Had they been performing some sort of procedure on him, that would be one thing. But that's not what we have here. It was just on competition. In your view, is the admissibility of Dr. Duran's expert opinion case dispositive? Well, I think in this case, yeah, I think it would be. I guess if we consider Dr. Duran's expert opinion, do you lose? Well, I think if you consider his opinion, it's still without foundation. I think the court below considered his opinion and felt that it was without adequate foundation under Rule 702 and Dominguez's case. And that was his reason for saying that. And I think, you know, while the case overall is reviewed de novo, it's an abuse of discretion under Rule 702 as to whether or not he was going to admit expert testimony. And based on the evidence that was presented, the ruling was that he didn't tie it to anything. It was basically, I say so, therefore it must be. And that just doesn't sit on all fours with Daubert or the Dominguez versus TLC case. Turning back to the, I guess, the state law claims here, Nevada law requires an affidavit of merit be brought along with the complaint. And it's a jurisdictional requirement. You don't get to the court unless you follow the affidavit along with the complaint. That didn't happen here. That was the reason for dismissing the state law-based malpractice claims. There were the two exceptions. We've already discussed the res ipsa section. The other one was a common knowledge exception under the Curtis case. One I'm very familiar with since it was my case in front of the Nevada Supreme Court. That was a case where the nurse gave the wrong medication and an expert wasn't needed. It's a known mistake where you give one patient somebody else's medication. That's a clear mistake. I see my time's up. All right. Thank you very much. Can I just make a quick response? We believe as far as the medical malpractice case is concerned, that issue and the issue of the affidavit, because this was a different body part, it was not required that there be an affidavit under Nevada law. But as to the deliberate indifference and the objectively unreasonable actions, if we take counsel's argument to its logical conclusion, then the police department and their personnel could determine that an individual was having some mental health problems, could then isolate him, restrain him, and view him on a regular basis. Every 15 minutes, the 1% of personnel was viewing him, and then the officers were viewing him every two hours. And if they do nothing, then they could be considered to be not to obviate any responsibility just by doing nothing. And I don't think that's what the law intends. They had him in isolation. They had him in restraints. They were providing him food and water. He wasn't eating. He wasn't drinking. He wasn't urinating. He had open wounds on his body. And yet, over a three-day period, it took him three days to get him medical attention. And I disagree that 33 hours just covered three days. It was three days that they had an opportunity. There were several shifts of nurses and personnel that saw him. And, in fact, one of the nurses did write out in her report that this individual needs to see a medical doctor and needs to see a psychiatrist. And with that, I will submit it to you, Your Honor. Thank you very much, Sean. Sorry. It's a very tragic case here. The case of Charlene Bynum v. Correct Care Solutions is submitted. Thank you both for your presentations.
judges: MURGUIA, Parker, LEE